IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-668 |
| | ) | |
| SUPERINTENDENT TENNIS | ) | |
| et al., | ) | |
| | ) | Judge David S. Cercone |
| Respondents. | ) | |
| | ) | Magistrate Judge |
| | ) | Francis X. Caiazza |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus filed by Eric Johnson pursuant to the provisions of 28 U.S.C. § 2254 be denied. Also, it is recommended that a Certificate of Appealability be denied.

### II. REPORT

The Petitioner, Eric Johnson ("Johnson" or "the Petitioner"), is a state prisoner incarcerated at the State Correctional Institution at Rockview, located in Bellefonte, Pennsylvania. Presently before this Court is his Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (Doc. 1).

A.   **Relevant Factual and Procedural Background**

On January 27, 1997, a jury empaneled by the Court of Common

1

Pleas of Allegheny County convicted Johnson of third-degree murder in the death of Valerie Duncan. Ms. Duncan was shot to death on December 24, 1993, while seated in a car parked on Elm Street in the Borough of Wilkinsburg. The car in which she was sitting was riddled with bullets and the Commonwealth proceeded under the theory that the shootings were between Johnson and a rival gang member, Rashod Clark, and that Ms. Duncan was accidentally killed in the process, or alternatively, she was in a car similar to one owned by a Crip gang member and that Johnson intentionally fired into the car.

At trial, Paul Williams testified that shortly after Ms. Duncan's homicide, he was with Johnson when a news program covering the incident appeared on television. (Trial Tr. at 344-45). Williams stated that Johnson told him that "he did it." (Id. at 346). He further testified that Johnson told him that he "emptied two clips" into the car, and expressed remorse over the fact that Ms. Duncan had been killed because he "didn't know there was a girl [in the car.]" (Id.)

Approximately ten days after the shooting, detectives acting on information provided by a confidential source went to a residence in Wilkinsburg searching for Johnson. He did not live at or own the residence, but he and others apparently used it for the purpose of selling drugs. Johnson fled the scene before the detectives could apprehend him. Investigators recovered a fully

2

loaded 9-mm Glock pistol from the scene.

At trial, the Commonwealth introduced evidence to establish that Johnson purchased the Glock pistol approximately one month before Ms. Duncan's murder. Personnel from the forensic science division of the Allegheny County Crime Lab testified that the pistol was the same weapon that was used in Ms. Duncan's homicide.[1] And, Williams testified that he saw Johnson with the pistol on the day of the shooting. (Trial Tr. at 348).

On July 25, 1995, more than eighteen months after the incident, Johnson was arrested in Philadelphia and charged with criminal homicide. He was convicted of third-degree murder and the Honorable Lawrence J. O'Toole sentenced him to a term of imprisonment of ten to twenty years.

After unsuccessfully seeking relief from his conviction in state court on direct appeal (Exs. 7, 9, 11-13, 16) and in a post-conviction proceeding pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA") (Exs. 24 & 26), Johnson filed with this Court a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1).

---

[1]   A firearms expert testified that of the thirty-plus shell casings found at the scene, twenty-seven were discharged by Johnson's pistol. (Ex. 26 at 3 n.3). (All Exhibits cited herein are attached to the Commonwealth's Answer at Doc. 11).

**B.**   <u>**Legal Analysis**</u>

   **(1)**   <u>**Standard of Review**</u>

   The Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub. L. No. 104-132 § 104, 110 Stat. 1214, restricts a

federal court's authority to grant relief when a state court has

previously adjudicated and rejected the petitioner's federal

constitutional claims. 28 U.S.C. § 2254(d). It provides:

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim
> that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d); <u>see</u> <u>also</u> <u>Williams v. Taylor</u>, 529 U.S. 362,

405-06 (2000); <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003).

   **(2)**   <u>**Sufficiency of the Evidence**</u>

   Johnson contends that the Commonwealth's evidence was

insufficient to sustain the jury's verdict of guilt of third-

degree murder. To assess a claim that the evidence is

constitutionally insufficient to sustain a conviction, a court

must consider whether, *viewing the evidence in the light most*

*favorable to the prosecution*, any rational finder of fact could

have found the essential elements of the crime beyond a

4

reasonable doubt.    Jackson v. Virginia, 443 U.S. 307, 319 (1979);

Orban v. Vaughn, 123 F.3d 727, 731-33 (3d Cir. 1997).

Under Pennsylvania law, third-degree murder is "[a]ll other
kinds of murder" that are not first-degree murder or second-
degree murder. 18 PA. CONS. STAT. § 2502(c). It requires a *mens
rea* of malice. See *e.g.* Commonwealth v. Ludwig, 874 A.2d 623,
630-31 (Pa. 2005). "[M]alice aforethought requires a unique state
of mind characterized by wickedness, hardness, cruelty,
recklessness, and disregard of social duty[.]" Ludwig, 874 A.2d
at 631-32. The term has "has been characterized as exhibiting an
*extreme* indifference to human life, and may be found to exist not
only in an intentional killing, but also in an unintentional
homicide where the perpetrator consciously disregarded an
unjustified and extremely high risk that his actions might cause
death or serious bodily harm." Id. (internal quotations and
citations omitted) (emphasis in original).

In denying this claim on the merits, the state courts
detailed the evidence admitted at trial, and concluded that when
viewed in a light most favorable to the Commonwealth it was
sufficient for a reasonable jury to conclude that Johnson killed
Ms. Duncan and that the killing was done with malice
aforethought. (Ex. 7 at 4-9; Ex. 9 at 5). Specifically, the state
courts noted that Paul Williams testified that Johnson admitted
to him that he was involved in the shootout that resulted in Ms.

Duncan's death. The Commonwealth also submitted evidence to establish that Johnson owned the Glock pistol that discharged the casings found in and around Ms. Duncan and the car in which she was seated. The state courts also pointed out that the Commonwealth presented evidence to establish that Johnson's Glock pistol was the gun that discharged twenty-seven of the casings involved in the shootout and that at least thirteen bullet holes riddled the car in which Ms. Duncan was seated. (See Ex. 7 at 5).

Johnson may take issue with the jury's crediting of the Commonwealth's case, but it was within its province to treat the evidence as it saw fit. And, as noted above, in reviewing this claim, this Court must consider the evidence in the light most favorable to the prosecution. Jackson, 443 U.S. at 319. In sum, the state courts' decision that there existed sufficient evidence to support a conviction of third-degree murder was not "contrary to" nor an "unreasonable application of[] clearly established Federal law," and it did not result "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

(3)  **Denial of the Motion to Suppress**

Johnson next contends that the trial court erred when it denied his motion to suppress the Glock pistol because it was seized without a warrant in violation of his Fourth Amendment

6

rights.  He raised this same claim before Judge O'Toole in a motion to suppress and in a subsequent hearing. Judge O'Toole denied the  motion, and the Pennsylvania Superior Court affirmed the decision of the trial court.[2] (Ex. 9 at 5-6).

In Stone v. Powell, 428 U.S. 465 (1976), the United States Supreme Court held that where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the grounds that evidence introduced at trial was obtained in an unconstitutional search or seizure. Id. at 494. In the instant case, Johnson had the opportunity to litigate the validity of the search and seizure before the suppression court and the state appellate courts. Thus, the state courts provided Johnson with an opportunity for full and fair litigation of the Fourth Amendment claim that he raises in the instant petition, and, therefore, that claim does not assert an appropriate basis for federal habeas review. Id.

### (4)   The Brady Claim

Prior to Johnson's trial, an individual named Paul Gaines spoke to FBI Special Agent Thomas Carter about several different

---

[2] Before the state courts, Johnson also claimed that the seizure of the Glock pistol violated his rights under Article 1, Section 8 of the Pennsylvania Constitution.  That state-law claim is not cognizable in federal habeas corpus review. Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.")

homicides. Regarding Ms. Duncan's homicide, Special Agent Carter

wrote in his notes:

> The homicide of VALERY DUNCAN. GAINES advised that the
> word on the street was that Rashad [sic] Clark from
> Wilkinsburg and **he** went with a North Avenue Gangster
> Crip from Wilkinsburg and did that.

(Ex. 16 at 5 (emphasis added by Superior Court)). Johnson claims

that the Commonwealth violated his due process rights as set

forth in Brady v. Maryland, 373 U.S. 83 (1963) because it failed

to provide to the defense Special Agent Carter's notes.

In Brady, the Supreme Court held that the suppression by the

prosecution of evidence favorable to an accused violates due

process where the evidence is material either to guilt or to

punishment, irrespective of the good or bad faith of the

prosecution. Id., 373 U.S. at 87. There are two components to a

Brady claim: 1) the evidence must have been suppressed by the

government, either intentionally or inadvertently; and 2) the

suppressed evidence was material. See e.g., Slutzker v. Johnson,

393 F.3d 373, 386 (3d Cir. 2004); see also Strickler v. Greene,

527 U.S. 263, 281-82 (1999).

Johnson satisfies the first Brady component. The

Commonwealth acknowledged that it did not disclose to the defense

Special Agent Carter's transcribed notes of his interview with

Gaines. Thus, the principal dispute here is whether Johnson can

demonstrate the second component of a Brady claim: that the

suppressed evidence was material. With respect to this issue, the

Court of Appeals for the Third Circuit Court recently stated:

> The Supreme Court has elucidated the Brady materiality
> standard as follows: "[The] touchstone of materiality
> is a 'reasonable probability' of a different result,
> and the adjective is important.  The question is not
> whether the defendant would more likely than not have
> received a different verdict with the evidence, but
> whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of
> confidence."

Slutzker, 393 F.3d at 387 (quoting Kyles v. Whitley, 514 U.S.

419, 434 (1995)).

On March 9, 2000, Judge O'Toole conducted a hearing to

determine whether the suppression of Special Agent Carter's notes

was material. Special Agent Carter testified at the hearing. He

stated that Johnson was the individual identified as the "he" in

the paragraph regarding the Duncan homicide:

> Q.   What, if any, information did Mr. Gaines give to
>      you regarding the homicide of Valerie Duncan?
>
> A.   Well, it was more discussion of Eric Johnson and
>      the homicides Eric Johnson – that he heard Eric
>      Johnson committed. And the next homicide offered
>      was that of Valerie Duncan.
>
> Q.   He being Mr. Gaines.
>
> A.   Yes. Mr. Gaines offered about Eric Johnson that he
>      heard the word on the street was Eric Johnson did
>      it with Rashad [sic] Clark.
>
> Q.   Following your interview with Mr. Gaines on the
>      date of August 9, 1996, did you prepare a report
>      to summarize your conversation?
>
> A.   Yes.
>
> [ADA DiGiovanni showed Special Agent Clark the
> transcription of Gaines's statement, which Clark

identified as an FBI report prepared by himself. Clark read into the record the entry relating to December 24, 1993]

Q.    I want to draw your attention to the pronoun he in the second paragraph. That being the homicide of Valerie Duncan. When you wrote that, sir, to whom did you intend that pronoun he to refer to?

. . . .

A.    Eric Johnson. [Also known as] Nip.

Q.    And would that be – and why did you write the pronoun he at that time?

A.    Well, it was a mistake. It should have said Eric Johnson and/or Nip. It was combined. We were talking about Eric Johnson, and he was written in the report to refer to Eric Johnson.

(3/9/00 Tr. at 8-10).

Gaines also testified at the hearing.  His testimony corroborated Special Agent Carter's. He stated that he told Special Agent Carter about a shootout between Johnson and Rashod Clark that resulted in Valerie Duncan's death. (Id. at 19-20).

Following the hearing, Judge O'Toole issued an Opinion in which he determined that Johnson was the individual designated as "he" in Special Agent Carter's transcription of Gaines's statement. (Ex. 13). As a result, Judge O'Toole stated that "any evidence regarding a statement by Paul Gaines that would have been offered at the original trial[ ] would not have been exculpatory to Mr. Johnson," and therefore was not material. (Id. at 2). The Pennsylvania Superior Court affirmed Judge O'Toole's decision and denied relief on this Brady claim. (Ex. 16).

The state courts' adjudication of this claim easily satisfies AEDPA's standard of review. Johnson has not demonstrated that Judge O'Toole's factual determinations were "an unreasonable determination of the facts in light of the evidence presented in" the hearing on the <u>Brady</u> claim, nor has he shown that the state courts' adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of" <u>Brady</u>. 28 U.S.C. § 2254(d)(1) & (2).

**(5)   <u>Ineffective Assistance of Trial Counsel</u>**

Johnson next argues that his trial counsel provided him with ineffective assistance. In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court of the United States held that in order to establish that counsel's service was constitutionally deficient, a petitioner must demonstrate: (1) that counsel's performance was unreasonable;[3] and (2) that the deficient performance prejudiced the defense.[4] See also <u>Wiggins v. Smith</u>,

---

[3]   To satisfy the first requirement of <u>Strickland</u>, the petitioner must establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." <u>Id.</u> at 689, 690-92. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the relevant time and place. <u>Id.</u> at 689.

[4]   To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors,

539 U.S. 510, 521 (2003) and Williams, 529 U.S. at 390-91.

    (a)  Failure to Object to Jury Instructions

Johnson claims that his trial counsel was ineffective for not objecting to the court's jury instructions on third-degree murder and manslaughter. He does not specify, however, the purported problem with those instructions. Before the Superior Court, he argued that trial counsel was ineffective for not objecting because "the Court instructed the jury that a 'specific intent to kill' applies to Third Degree Murder." (Ex. 26 at 8 n.8). The Superior Court sternly rejected this claim, stating: "The record makes plain that [Johnson's] self serving accusation is patently false. In fact, [Johnson's] mischaracterization of the court's instructions borders on misrepresentation of the record, which this Court will not countenance." (Id.)

Nonetheless, the Superior Court reviewed the trial court's charge in its entirety and found no error on its homicide instructions. This Court is bound by the state court's determination that the instruction comported with Pennsylvania law. Priester v. Vaughn, 382 F.3d 394, 401 (3d Cir. 2004) (federal habeas court cannot "reexamine state court determinations on state-law questions.") (citing Estelle, 502 U.S. at 67-68).

_____

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

(b)   <u>Failure to Request a Corrupt Source Instruction</u>

Johnson next contends that his trial counsel provided him with ineffective assistance because he failed to request a "corrupt source" jury instruction regarding Eric Hester's and Paul Williams's testimony. The Superior Court rejected this claim as "utterly meritless." (Ex. 26 at 9). It explained:

> The law is clear that a corrupt source change is warranted only where the evidence is sufficient to present a jury question as to whether a Commonwealth witness was also an accomplice in the crime for which the accused is charged. Such an instruction is only indicated when the evidence shows that the witness was an active partner in committing the crime with the intent to assist the principal. Where, however, there is no evidence that would permit the jury to infer that a Commonwealth witness was an accomplice, the court may conclude as a matter of law that the witness was not an accomplice and decline to give the charge.
>
>     Here, neither of the proposed witnesses was an accomplice to the defendant in murdering Ms. Duncan. A corrupt source instruction, therefore, was not warranted in this case. Because trial counsel cannot be deemed ineffective for failing to raise a meritless claim, [Johnson's] ineffectiveness claim fails.

(<u>Id.</u> at 9-10 (internal citations omitted)).

Once again, this Court is bound by the Superior Court's state-law determination that a corrupt source instruction was not warranted in this case. <u>Estelle</u>, 502 U.S. at 67-68; <u>Priester</u>, 382 F.3d at 401.

(c) <u>Failure to Introduce Rashod Clark's statement</u>

Johnson next claims that trial counsel was ineffective for failing to introduce the allegedly exculpatory audio-taped

statement of Rashod Clark. In this statement, which was

introduced as evidence in Rashod Clark's 1994 trial for the

homicide of Valerie Duncan,[5] Clark said:

> All the ones I have gone on [shootings by his gang, the
> Crips] they have always messed them up. They messed
> everything up. See, when I was going we was mostly
> doing walk-bys [as opposed to drive-by shootings]. We
> was walking up there on foot. We was walking up there
> and we never got no - to tell you the truth, nobody
> really - they are just now starting to get people.
> After I was out - after I got out of the hospital I was
> chilling for a while after I got shot. I ain't really
> did nothing and - they were still doing stuff - they
> still doing stuff and now they are just starting to hit
> people.

(Ex. 26 at 10) (quoting from Clark's 1994 Trial Transcript).

Johnson argues that Clark's statement establishes that he

(Clark) was responsible for Valerie Duncan's murder and that it

undercuts the Commonwealth's case against Johnson himself. As the

Superior Court noted in rejecting this claim, we "fail to see how

the absence of this statement prejudiced" Johnson. (Ex. 26 at

10). Most significantly, in Clark's statement, he does not refer

to Valerie Duncan's shooting. (Id.) Moreover, the Commonwealth's

theory at Johnson's trial was that Clark and Johnson, who were

from rival gangs, were shooting at each other and that Valerie

Duncan was an innocent bystander, or that Johnson intentionally

shot into the car in which Duncan was sitting because he believed

---

[5] In September 1994 (several months prior to Johnson's arrest for Ms.
Duncan's homicide), Clark was convicted of first-degree murder in the
death of Valerie Duncan.

it belonged to a Crip. (Id.) The taped statement of Clark simply does not contradict or call into question the Commonwealth's theory of the case.

(d) Conclusion

Johnson has failed to demonstrate that the Superior Court's adjudication of his ineffective assistance of trial counsel claims was "contrary to" Strickland. Although the Superior Court did not cite Strickland in denying his claims, it did rely on Pennsylvania cases that set out an identical standard for ineffectiveness. (Ex. 26 at 6); Werts v. Vaughn, 228 F.3d 178, 202-03 (3d Cir. 2000) (examining Pennsylvania ineffective assistance law and determining that it is identical to the Strickland standard). As the Williams Court explained, "a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause". Williams, 529 U.S. at 406.

Johnson likewise has failed to demonstrate that the Superior Court's decision was an "unreasonable application" of Strickland, or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented[.]" 28 U.S.C.§ 2254(d). There was no basis for counsel to object to the third-degree murder instruction or to request the corrupt source instruction. Likewise, Johnson was not prejudiced by counsel's complained-of conduct because the

homicide instructions adequately conveyed Pennsylvania law, the trial court would not have provided the corrupt source instruction even if counsel had requested it, and finally, Rashod Clark's statement would not have assisted Johnson's defense.

### (6) Errors During PCRA Proceedings

Finally, Johnson contends that his PCRA counsel provided him with ineffective assistance for failing to present Clark's guilty plea as after-discovered exculpatory evidence.[6] This claim is not

---

[6]  By way of background, after Johnson's 1997 conviction, Clark filed a PCRA petition claiming that he was entitled to a new trial because the Commonwealth had changed its theory of how Ms. Duncan was killed between Clark's 1994 trial and Johnson's trial. Clark was awarded a new trial. He subsequently pled guilty to third-degree murder and aggravated assault and was sentenced to ten to twenty years imprisonment.

It is not clear from the record the date on which Clark pled guilty to third-degree murder, but it appears that it occurred after Johnson's direct appeal counsel could have raised a claim premised on the guilty plea. (See Petition to Amend Concise Statement of Matters Complained of on Appeal, ¶ 11 (noting that at his PCRA hearing Clark stated that "he shot at Eric Johnson first") and Amended Concise Statement of Matters Complained of on Appeal, ¶ 1.b)).

As for PCRA counsel (Scott Coffey, Esquire), in his no-merit letter to Judge O'Toole, he  explained that a new trial was not warranted on the basis that Clark pled guilty to third-degree murder. (Ex. 20 at 14). Counsel stated:

> Mr. Clark could have pled guilty for any myriad of reasons, but first and foremost was the fact that witnesses placed him at the scene shooting a gun (not necessar[ily] at the car in which Duncan was sitting but possibly at [Johnson]) and the Commonwealth had a strong case against him. However, the fact that Clark pled guilty to third-degree murder does not in any way exonerate [Johnson] since the evidence presented against [Johnson] at trial indicated that both [he] and Clark were allegedly shooting at each other and some of [Johnson's] bullets allegedly were meant for Clark but hit the K-car [in which Ms. Duncan was sitting] instead, or some of [Johnson's] bullets were also allegedly meant to be aimed toward the K-car … since it resembled a K-car owned by a Crip, who was a fellow gang member of Clark. Therefore, the existence of Clark's plea would in no way

16

cognizable in federal habeas corpus because there is no federal
right to effective assistance of post-conviction counsel.
Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("Our cases
establish that the right to appointed counsel extends to the
first appeal of right, and no further.") He also claims that his
due process rights were violated because the Superior Court
refused to accept, during the PCRA proceedings, his Post Sub-
Communication petition. This claim also is not cognizable on
federal habeas corpus review. Hassine v. Zimmerman, 160 F.3d 941,
954 (3d Cir. 1998)("The federal role in reviewing an application
for habeas corpus is limited to evaluating what occurred in the
state or federal proceedings that actually led to the
petitioner's conviction; what occurred in the petitioner's
*collateral* proceeding does not enter into the habeas calculation
. . . . Federal habeas power is limited . . . to a determination
of whether there has been an improper detention by virtue of the
state court judgment.")(internal quotations omitted).

(7)   **Certificate of Appealability**

Section 102 of AEDPA, 28 U.S.C. § 2253(c) (as amended),
codifies standards governing the issuance of a certificate of

---

exonerate [Johnson] of the instant third-degree murder
conviction or compel a different outcome in [Johnson's]
case.

(Id.) The Superior Court agreed with counsel's assessment and denied
Johnson's claim that his PCRA counsel provided him with ineffective
assistance in this regard. It held that Clark's plea "does not
preclude [Johnson's] guilt for the same crime." (Ex. 26 at 11).

appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." Because Johnson has not made such a showing, a certificate of appealability should be denied.

### III. CONCLUSION

It is recommended that, pursuant to 28 U.S.C. § 2244(b) and Rule 9 of the Rules Governing Habeas Corpus Cases Under Section 2254, that the Petition for Writ of Habeas Corpus be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Francis X. Caiazza
United States Magistrate Judge

Dated: March 14, 2006.


cc:  The Honorable David S. Cercone


18

All Parties of Record

All Parties of Record